**Michael MEYER, Plaintiff,**

v.

**CARNIVAL CORPORATION, et al., Defendants.**

**Case No. 12–20321–CIV.**

United States District Court, S.D. Florida.

March 28, 2013.

---

**1254**

Michael D. Eriksen, Eriksen Law Firm, West Palm Beach, FL, Brock Ohlson, Richard Harris Law Firm, Las Vegas, NV, for Plaintiff.

Jerry Dean Hamilton, Hamilton Miller & Birthisel LLP, Adam David Warden, Jeffrey Eric Foreman, Noah Daniel Silverman, Foreman Friedman, P.A., James Jones, Jr., The Jones Firm, PLLC, Miami, FL, for Defendants.

*ORDER*

WILLIAM J. ZLOCH, District Judge.

THIS MATTER is before the Court upon Defendant Cox & Company, Ltd.'s, Motion To Dismiss Plaintiff's Amended Complaint (DE 68). The Court held an evidentiary Hearing on the instant Motion (DE 68) on December 3, 2012. The Court has carefully reviewed said Motion, the entire court file and is otherwise fully advised in the premises.

### I. Background

The above-styled cause arises out of a cruise taken by Plaintiff Michael Meyer ("Meyer") and operated by Defendant Carnival Corporation ("Carnival") in March of 2011. *See* DE 57. While on said cruise, Plaintiff Meyer took an excursion to the Pitons, the eroded remnants of two volcanic formations on the southwestern coast of the island of Saint Lucia, and a popular destination for tourists to the island. Said excursion was operated by Defendant Cox & Company, Ltd. ("Cox"), a Saint Lucian company. Plaintiff alleges that while on the excursion, he sustained injuries. By the instant Motion (DE 68), Defendant Cox argues, *inter alia,* that the Court cannot exercise personal jurisdiction over it. The Court will first consider this threshold jurisdictional issue.

### II. Personal Jurisdiction

The Court's analysis of this issue rests first on the interpretation of two contracts. The first contract, a Cruise Ticket Contract made between Defendant Carnival and Plaintiff Meyer, states:

[I]t is agreed by and between the Guest and Carnival that all disputes and matters whatsoever arising under, in connection with or incident to this Contract or the Guest's cruise, including travel to and from the vessel, shall be litigated, if at all, before the United States District

Court for the Southern District of Florida in Miami . . .

DE 69–1, p. 18. The second, and more important of the two contracts, the Standard Excursion Contract, was executed between Defendant Cox and Defendant Carnival. DE 68–2 The relevant portion of this contract is a conferral of jurisdiction clause, stating in pertinent part:

In the event of litigation, the prevailing party shall be entitled to recover all costs incurred in connection with the litigation including, without limitation, reasonable attorney's fees. OPERATOR [Cox] consents to the personal jurisdiction over it and to the venue of the courts serving the Southern District of Florida in the event of any lawsuit to which CARNIVAL is a party and which is related to, in connection with, arising from or involving the Shore Excursion or the terms of this Agreement.

DE 68–2, p. 3. The record also includes a Catamaran Ticket Contract (DE 69–1, p. 42), which Plaintiff alleges was executed between Meyer and Carnival/Cox, and drafted by Carnival. The Catamaran Ticket Contract contains neither a forum selection clause nor a conferral of jurisdiction clause.

Plaintiff has stated that he brings the above-styled cause under the Court's diversity jurisdiction, 28 U.S.C. § 1332, and/or the Court's general maritime jurisdiction, 28 U.S.C. § 1333, and/or the Court's supplemental jurisdiction, 28 U.S.C. § 1367, and/or the Extension of Admiralty Jurisdiction Act, 46, U.S.C. § 30101. DE 57, p. 2. Indeed, the allegations of Plaintiff's Amended Complaint (DE 57) satisfy the requirements of diversity jurisdiction, and the Court is also able to exercise its original jurisdiction over the above-styled cause as it involves a claim arising under the laws of the United States. The Court must therefore decide whether it can apply solely federal law, or

must also apply Florida state law, including Florida's long-arm statute, in determining if it can properly exercise personal jurisdiction over Defendant Cox.

Plaintiff argues that the Court need only apply federal law in enforcing the conferral of jurisdiction clause found in the Standard Excursion Contract. Citing to the seminal *Burger King* case, Plaintiff echoes the Supreme Court's statement that "because the personal jurisdiction requirement is a waivable right, there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 473 n. 14, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (internal citations omitted). In that case, the Supreme Court further emphasized that "parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction" and these "forum-selection provision" do not offend due process where they have been obtained through "'freely negotiated' agreements and are not 'unreasonable and unjust.'" *Id.* (internal citations omitted). However, that case is distinguishable from this case for two reasons. First, in this case Plaintiff Meyer is attempting to enforce a contract to which Plaintiff was not a party, the Standard Excursion Contract. Second, the jurisdictional element of the contract is a conferral of jurisdiction clause and not a forum-selection clause.

Plaintiff has also cited to the Eleventh Circuit's holding in *Alexander Proudfoot Co. v. Thayer,* in which the court considered the application of the *Erie* doctrine to a case in which two parties "specifically consent[ed] to personal jurisdiction in Florida" by way of a forum selection clause. 877 F.2d 912, 914 (11th Cir.1989). In that case, the Eleventh Circuit considered the aims of the *Erie* doctrine, one of

which is to avoid forum shopping. *Id.* at 918. The Court noted that federal law favors the enforcement of conferral of personal jurisdiction clauses, while under Florida law "conferral of personal jurisdiction clauses are not enforced unless an independent ground for personal jurisdiction exists under the Florida Long Arm Statute." *Id.* (*citing McRae v. J.D./M.D., Inc.*, 511 So.2d 540 (Fla.1987)). The Eleventh Circuit considered the hypothetical situation in which a district court in Florida would apply federal law to the exclusion of Florida state law:

> A diverse plaintiff suing a defendant without any contacts in the forum state, but who has signed a conferral of personal jurisdiction clause, may file suit in federal or state court. A federal court would enforce the conferral of personal jurisdiction clause under federal law, and the action would proceed. The plaintiff suing the same defendant in state court would face dismissal for lack of personal jurisdiction, the contractual clause notwithstanding. This difference in outcomes indicates that a plaintiff with a choice of forum would file in federal court to escape the effect of the state law. Accordingly, the application of federal judge-made law would disserve the first aim of *Erie*.

*Id.* at 918–19. This portion of *Proudfoot* that has been misquoted by Plaintiff only illustrates what would happen if a district court, sitting in diversity, were to only apply federal law in determining the validity of a forum selection clause. After all, in *Proudfoot*, the Eleventh Circuit held that Florida state law had to be applied, as applying solely federal law "would encourage forum shopping and promote the inequitable administration of the laws." *Id.* at 919.

This case is analogous to another case in the Southern District of Florida, in which a non-party to a contract tried to enforce a forum selection clause mandating that suits be brought in Miami Dade County, Florida. In *Barnett v. Carnival Corp.*, Carnival Corporation and the cruise line's physician had agreed upon the venue for any litigation arising under their Independent contractor Agreement. 2007 WL 1526658, at *4 (S.D.Fla. May 23, 2007). In holding that the plaintiff, an outsider to the contract, could not enforce this clause as a "waiver of personal jurisdiction," the court found that "Dr. Monther's contractual consent to litigate disputes with Carnival Corporation regarding their Independent Contractor Agreement cannot be expanded to include consent to litigate disputes with the plaintiff or any other third parties with whom he did not contract to expressly waive any of his rights regarding personal jurisdiction vis-a-vis such third parties." *Id.* Further, the court found that the forum selection clause contained within the passenger ticket between the plaintiff and Carnival could not be applied to Dr. Monther, as he was not a party to that contract either. *Id.* Thus, the Court turned to Florida's long-arm statute, and upon finding that none of those enumerated bases for establishing jurisdiction existed, the Court granted the motion to dismiss. *Id.; compare with Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (enforcing a forum selection clause against an individual who *was* a party to the contract, despite the fact that the contract was not the product of negotiation).

 In this case, the Court is presented with the same relationships between the Parties as in *Barnett*. Plaintiff Meyer cannot enforce, against Defendant Cox, the conferral of jurisdiction clause contained within the Standard Excursion Contract because Plaintiff was not a party to said contract. Further, just as in *Barnett*, Plaintiff Meyer cannot enforce,

against Defendant Cox, the forum selection clause contained within the Ticket Contract made between Plaintiff and Defendant Carnival, because Defendant Cox was not a party to said contract.

Plaintiff has also argued that he can enforce the conferral of jurisdiction clause as a third-party beneficiary, or that Defendant Cox is subject to the forum selection clause in the Cruise Ticket Contract as a third-party beneficiary. Plaintiff has cited to a number of cases in other jurisdictions for this proposition. *See Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1406–07 (9th Cir.1994); *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202–03 (3d Cir.1983); *Mohamed v. Chicago Title Ins.*, 2012 WL 4955309 (E.D.Wis. Oct. 17, 2012); *First Financial Management v. University Painters*, 2012 WL 1150131 (E.D.Pa. Apr. 5, 2012); *Productive People v. Ives Design*, 2009 WL 1749751 (D.Ariz. June 18, 2009); *Dos Santos v. Bell Helicopter*, 651 F.Supp.2d 550 (N.D.Tex.2009).

However, the Court notes that it is bound by the Eleventh Circuit's determination in *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285 (1998). While the Eleventh Circuit did say that in order to bind a non-party to a forum-selection clause, "a third-party beneficiary status is not required," the court did note that the interests of the two spouses in that case were "completely derivative" of the named plaintiffs and thus "directly related to, if not predicated upon" the interests of the named plaintiffs. *Id.* at 1299. Here, Plaintiff has provided no compelling reason that his interests are "completely derivative" of Defendant Carnival's or Defendant Cox's in regard to the Standard Excursion Contract, or that Defendant Cox's interests are "completely derivative" of Defendant Carnival's in regard to the Cruise Ticket Contract. Further, the Court follows the reasoning in *Barnett*, in

which that court in the Southern District of Florida found that an inquiry into the scope of Florida's long-arm statute was necessary. 2007 WL 1526658, at *4.

Accordingly, having found that the conferral of jurisdiction clause contained within the Standard Excursion Contract and the forum-selection clause found within the Cruise Ticket Contract are not dispositive of the issue of personal jurisdiction, the Court must engage in a two-part analysis. *Proudfoot*, 877 F.2d at 919. The Court must first determine whether it can exercise jurisdiction over Defendant Cox under Florida's long-arm statute, and then determine whether asserting jurisdiction will offend the due process clause of the Fourteenth Amendment. *Id.*

The plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction over a foreign defendant. *Stubbs v. Wyndham Nassau Resort*, 447 F.3d 1357, 1360 (11th Cir.2006) (*citing Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002)). This *prima facie* case is met if the plaintiff " 'presents enough evidence to withstand a motion for directed verdict.' " *Id.* (*quoting Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990)). When the defendant submits affidavits tending to disprove the plaintiff's showing of personal jurisdiction as alleged in the complaint, "the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.* Where the allegations in the complaint and the defendant's proffer of evidence conflict, the court "must construe all reasonable inferences in favor of the plaintiff." *Id.*

### A. Florida's Long–Arm Statute

Plaintiff asserts that Defendant Cox's contacts with the state of Florida satisfy

three different sections of Florida's long-arm statute. The Court will consider each of these arguments in turn.

■ The "General Jurisdiction" section of Florida's Long-Arm Statute provides that an individual engaged in the following acts will be subject to the jurisdiction of the courts of the state of Florida:

A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

Fla. Stat. § 48.193(2). The Court finds that Defendant Cox's acts in the state of Florida satisfy this portion of the long-arm statute.

■ Florida courts have interpreted the "substantial and not isolated activity" requirement of section 48.193(2) to mean " 'continuous and systematic general business contact' with Florida." *Woods v. Nova Companies Belize, Ltd.*, 739 So.2d 617, 620 (Fla.Dist.Ct.App.1999). Further, if the defendant's contacts with the state of Florida meet this standard, the constitutional requirements of minimum contacts are also deemed to be satisfied. *Id.*

In *Woods*, the defendant, a Belizean corporation, imported ninety percept of its total shrimp sales to the United States, and eighteen percent to Florida importers. *Id.* at 619. The defendant also used a Florida broker to arrange for customs and FDA approval of its shrimp, used storage facilities in Florida, and purchased equipment and supplies from Florida businesses. In finding that the defendant's contacts with the state of Florida met the requirements of section 48.193(2), the court stated that those contacts inside the state demonstrated that the defendant "establish[ed] essential business relationships in this state, all within its ongoing commercial relationship with Florida." *Id.* at

620–21. The court also emphasized that "[w]hile any of these activities alone may not be deemed sufficient, considered collectively, they establish personal jurisdiction." *Id.* at 621 (*citing Nichols v. Paulucci*, 652 So.2d 389, 392–93 (Fla.Dist.Ct. App.1995)).

The Eleventh Circuit has held that general jurisdiction over a foreign defendant can be found when the foreign defendant's agency relationship with a Florida-based defendant rises to such a level that the Florida entity is "the entit[y] through which the [foreign defendant] conduct[s] business activity in Florida." *Meier v. Sun Int'l Hotels*, 288 F.3d 1264, 1272 (11th Cir.2002). Thus in *Meier*, the foreign defendants, which owned and operated the Atlantis hotel had Florida subsidiaries that solicited and coordinated reservations for the hotel's guests, marketed for the hotel, and provided accounting services for the hotel. *Id.* at 1272–73. In holding that the court could exercise personal jurisdiction over the foreign defendants, the court found that the affiliated Florida corporations were mere "instrumentalities" of the foreign defendants. *Id.* at 1273. Outside of this agency relationship, the court also noted in its holding that the foreign defendants maintained and staffed several Florida phone numbers on its website, held seven bank accounts in Florida, and staffed a Ft. Lauderdale attorney. *Id.* at 1274 n. 13.

Further, in *Stubbs*, the Eleventh Circuit found that the activities of the foreign defendant through its agent "considered collectively [ ] show[ed] a general course of business activity in the State for pecuniary benefit." 447 F.3d at 1361 (internal citations omitted). In *Stubbs*, the foreign defendant, Nassau, had a corporate subsidiary in Florida that acted as its advertising and booking agent. *Id.* at 1362. The two companies also shared an address on cer-

tain advertisements and checks. *Id.* The Eleventh Circuit thus made a finding of general jurisdiction based on the agency relationship between the two companies. *Id.* However, the court also made note of the foreign company's direct contacts with the state of Florida, including: maintaining numerous other commercial relationships with Florida-based entities, "including travel and vacation agencies, lawyers, insurance brokers, advertisers, and a host of construction and home decor companies." *Id.* Nassau also had a significant portion of its vendors in Florida and had at least six bank accounts in Florida. *Id.*

In another case, *Universal Caribbean Establishment v. Bard,* the Fourth District Court of Appeals of Florida found that general jurisdiction existed over a foreign defendant based, in part, on that defendant's agency relationship with a Florida company. 543 So.2d 447 (Fla.Dist.Ct.App. 1989). The Florida defendant, Limited, was in business "as a tour operator solely for [the foreign company, Universal Caribbean's] resort." *Id.* at 448. The two worked jointly to promote their respective businesses: Limited advertised that it was the tour agent for "our own hotel," the two companies advertised their services together, and the foreign defendant made business trips to Florida to meet with the Florida-based company. *Id.* As the court in that case found, when considering all of the facts "as a whole," it was clear that the foreign defendant "engage[d] in substantial activity in [Florida] *through* Limited." *Id.* at 448.

Cox asserts that it is a Saint Lucian business with minimal ties to Florida. However, Cox's web page has on its front page, a phone number with a 305 area code, corresponding to Miami–Dade County. *Id.,* p. 75–77. The company also uses this phone number in its outgoing emails. *Id.,* pp. 80–83.

As Plaintiff aptly described at the December 3, 2012, Hearing, in order to implement its business model of attracting customers, Defendant Cox came to the "Mecca" of cruise ship passengers in the United States. DE 167, p. 37. While 700,000 passengers per year are brought to Saint Lucia on cruise ships, the only way Cox can attract these customers to its shore excursions is by reaching out to Florida-based cruise lines and establishing partnerships with them. This is because Florida has been called "the Cruise Capital of the World," *see* DE 94, p. 42, and approximately three-fourths of the cruise line market is controlled by two carriers, Carnival, and Royal Caribbean Cruise Lines, Ltd. ("Royal Caribbean"). *Id.,* p. 44. Both of these companies maintain their principal place of business in Miami, Florida. *Id.,* pp. 44–45.

Excursions on cruise ships are a major source of revenue for cruise lines, and in 2009, more passengers on cruise lines purchased shore excursions than any other goods or services. DE 95–1, p. 52. For Defendant Carnival, for example, shore excursions are a great source of profit, and as Carnival's representative conceded, its annual shore excursion program could exceed one hundred million dollars. DE 94–1, p. 19.

When a cruise operator like Carnival decides to port at a given location, it has no trouble finding local excursion companies to partner with. As Carnival's representative explained, "[a]ny time that a new itinerary comes, whether it be a new part, we receive numerous proposals from tour operators as to ... what excursions they have and wish to offer to Carnival Cruise Lines." *Id.,* p. 36. This is because partnering with a major cruise line such as Carnival can be highly lucrative for the local touring companies. For Defendant Cox, for example, ninety-five percent of

the participants in its excursions have come from the cruise lines. DE 98–3. At any given time over the last five years and throughout that period, there have been ten or twelve Saint Lucia excursions that would be arranged for Carnival passengers through Cox. DE 94–1, p. 74. One of the other benefits for a local tour operator like Defendant Cox is that when they form an agreement with a national cruise line like Carnival, they receive the benefits of Carnival's advertising efforts in the United States directed toward their actual and potential customers. DE 94–1, p. 123.

Carnival and Cox have had a business relationship since May 1, 2003. DE 94–2, p. 72. Carnival has also helped Defendant Cox in maintaining its position as a leading provider of shore excursions in Saint Lucia. Over the past five years, for example, Defendant Cox has competed with numerous other shore excursion operators in Saint Lucia. DE 98–1, p. 378. One way that Carnival helps promote Cox's business is by recommending to guests that they not engage in excursions, tours, or activities outside of those specifically marketed and sold by Carnival, such as Cox's Catamaran Cruise to the Pitons. DE 94–2, p. 47. Carnival also helps promote Cox's business by advertising Cox's excursions on its website, on board through a presentation made by the cruise director, through fliers aboard the vessel, and televised in the guests' staterooms. DE 94–1, p. 118–19.

In order to sell tickets on its excursions, Cox gives Defendant Carnival authority, by agreement, to market and sell tickets to its passengers. DE 94–1, p. 153. On the page of its website detailing said excursions, Carnival states "Carnival acts only as an agent for the independent tour operators supplying excursions or services." DE 94–2, p. 6. This website also refers to tour operators, such as Cox, as "Carnival's Shore Excursion Providers," who provide "our handpicked tours" to Carnival guests. DE 94–2, pp. 171 & 175.

Cox has also maintained a relationship with other Florida-based, cruise lines. First, Cox has maintained a relationship with the other leading cruise line in Florida, Royal Caribbean, since 2001. DE 99–1, p. 2. Since 2005, the two have maintained formal written contracts by which Cox would provide shore excursions and tours to Royal Caribbean guests exclusively in Saint Lucia. *Id.* As part of this agreement, Royal Caribbean marketed and sold tickets for Cox's shore excursions on its website, over the phone, and aboard the Royal Caribbean vessels. *Id.* Until two years ago, Cox had a business relationship with Florida-based Norwegian Cruise Lines, DE 98–1, p. 110, and has had an ongoing excursion agreement with Prestige Cruise Lines in Miami for the past six years. *Id.*, p. 296–97.

The record reveals that officials from Cox have affirmatively fostered these relationships with Florida-based cruise lines, such as by traveling to Miami to attend cruise line conferences, DE 98, p. 133, or meeting with Carnival officials at its Doral headquarters. DE 94–1, p. 72. During these meetings, Cox and Carnival officials have spoken about the existing tours, potential new tours, costs paid by Carnival to Cox, and components of the excursions. DE 94–1, p. 81.

Defendant Cox has also been able to maintain its business relationships with Florida-based cruise lines through its membership in the Florida Caribbean Cruise Association ("FCCA"). The FCCA is a non-profit trade organization composed of fourteen member lines operating more than 100 vessels in Florida, the Caribbean, and Latin American waters. DE 95–1, p. 61. The FCCA also offers membership to non-cruise line members, such as Cox, and Cox is in fact a platinum

member of the FCCA. *Id.,* p. 38. Platinum members such as Cox receive valuable mediums in which to network with cruise line executives at FCCA functions. *Id.* Cox has also been listed in the FCCA's Membership Directory, which is circulated to cruise line executives, *id.,* p. 39–40, and Cox has had access to the FCCA's advertising program and FCCA's insurance program, *id.,* p. 41. Through the FCCA, Cox has had articles printed in FCCA's Cruising Magazine detailing and advertising Cox's company, *id.,* p. 47–48.

, Defendant Cox has also maintained liability insurance through a U.S. insurance company. From 2002 until 2009, Cox procured insurance through Miami-based insurance broker Royal Marine Insurance Group ("RMIG"). DE 96–1, p. 77–78. During this time, RMIG functioned as Cox's "agent" for purposes of binding insurance for Cox and arranging premium financing with TotalBank, a Florida-based bank. Cox, through RMIG, took out six separate annual bank loans at TotalBank in Miami for each of 2003, 2004, 2005, 2006, 2007, and 2008, to pay the premiums for Cox's U.S. liability insurance policies. DE 97–1, pp. 97–98. According to TotalBank, RMIG acted as Cox's agent by writing the policy and providing the premium financing option to its customer, Cox. *Id.,* p. 21. In Cox's loan documents for 2006, 2007, and 2008, Cox's principal address is listed as 8300 NW 53rd Street, Suite 102, Miami Florida 33166, RMIG's address, with a telephone number of 305–477–3755, RMIG's telephone number. *Id.,* pp. 23–24. The finance agreements also appoint TotalBank as Cox's "attorney-in-fact" for certain purposes, and they incorporate Florida law. DE 98–2, pp. 21–22. Defendant Cox paid taxes in Florida for each of these six loans. DE 97, pp. 42–45.

In 2009, Cox ceased its business relationship with RMIG, and began to procure insurance through Aon Risk Services of Florida, Inc. ("Aon"). DE 98, p. 50. Since that year, Cox has signed a letter formally appointing Miami-based Aon as Cox's U.S. "Agent of Record" for purposes of insurance. *Id.,* pp. 85–94. This has enabled Aon to procure insurance for Cox to cover Cox's excursions with Carnival, a Florida-based cruise line.

Cox's excursion business has been successful, and in 2009, it listed its current revenues from its operations as $2,700,000.00, with a projected 2010 revenue of $2,800,000.00. Carnival has described Cox as "the prominent company in St. Lucia" for shore excursions. DE 94–1, p. 74. And at any given time over the last five years, Cox has had ten to twelve Saint Lucia excursions for Carnival passengers. *Id.*

Based on the foregoing facts, the Court finds that Defendant Cox has "engaged in substantial and not isolated activity within this state" under the "General Jurisdiction" section of Florida's long-arm statute. Fla. Stat. § 48.193(2). The Court also finds that in the aggregate, Cox's business activities in the state of Florida establish general jurisdiction and that "[w]hile any of these activities alone may not be deemed sufficient, considered collectively, they establish personal jurisdiction." *Woods,* 739 So.2d at 621.

First and foremost, the record evidence shows that Cox has successfully procured, established, and maintained relationships with Florida-based entities such that those entities are the means by which Cox "conduct[s] [its] business activity in Florida." *Meier,* 288 F.3d at 1272. The reason why Cox must work with Florida companies, is of course, because Florida is the "Cruise Capital of the World." And indeed, like the foreign defendant in *Woods,* ninety-five percent of the participants in Cox's excursions have come from the cruise lines. 739 So.2d at 619.

The first of these relationships is, of course, Cox's relationship with Carnival. While in cases like *Meier* and *Stubbs* there were direct parent-subsidiary relationships between the foreign defendants and the Florida-based defendants, it is of no matter that Cox is not owned by Carnival. The evidence has established that Cox is able to maintain its position as a lead provider of shore excursions because of Carnival's efforts to promote and advertise Cox's business. Indeed, Cox has many other competitors in Saint Lucia in the shore excursion business, but in the past five years, Carnival's efforts in working with Cox have resulted in Cox providing ten to twelve Saint Lucian excursions for Carnival passengers. Like the Florida-based defendants in *Meier* and *Stubbs*, Carnival has aided Cox in its business by directly marketing and selling tickets to its passengers and recommending to them that they not buy excursion packages outside of those marketed by Carnival. 288 F.3d at 1272–73, 447 F.3d at 1362; *see also Woods*, 739 So.2d at 619. Further, like the Florida-based defendant in *Bard*, Carnival has even stated on its website that it acts as an agent for Cox, and further stated that Carnival's excursion providers, such as Cox, provide "our handpicked tours" to Carnival guests. 543 So.2d at 448; DE 94–2, pp. 171 & 175. Thus, this agency relationship between Cox and Carnival is no less important to the jurisdictional analysis because Cox is not owned by Carnival. Indeed, Cox is able to maintain its status as a leading tour operator in Saint Lucia because of its relationship with Carnival, and Cox effectively conducts business in the state of Florida through Carnival. *Meier*, 288 F.3d at 1272.

Cox has maintained commercial relationships with other Florida-based entities, including the cruise lines Royal Caribbean and Norwegian Cruise, similar to the foreign defendant in *Stubbs*, 447 F.3d at 1362. Further, Cox has had other contacts with the state of Florida, outside of its relationship with Carnival and other cruise lines. Just like the foreign defendant in *Meier*, Cox has maintained Florida phone numbers, and Cox has kept bank accounts in Florida. 288 F.3d at 1274 n. 13. Cox has also procured insurance through Florida companies and has maintained these companies' representatives as Cox's "Agent of Record" for its insurance purposes. *Stubbs*, 447 F.3d at 1362. Finally, Cox has advertised its business through its platinum membership with the FCCA, and has had articles about its business printed in the FCCA's Cruising Magazine.

Thus, the Court finds that Defendant Cox is subject to personal jurisdiction pursuant to section 48.193(2) of Florida's long-arm statute. Plaintiff has also argued that Cox is subject to personal jurisdiction under section 48.193(1)(a) and (b). These sections provide:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

Fla. Stat. 48.193(1)(a), (b).

As to section (a), a court in the Southern District of Florida have found the requirements of this section satisfied when a foreign defendant "solicited business in Florida and ha[d] an agent in Florida to arrange for cargo transportation." *Poston v. American President Lines, Ltd.*, 452

F.Supp. 568, 571 (S.D.Fla.1978). In another case, the Florida District Court of Appeals emphasized that this section can be satisfied based on a foreign defendant's agency relationship with a Florida-based defendant, because "there need be no local office nor agent, no lease, no meeting, no presence of corporate offices in Florida to warrant a finding of engagement in a business venture." *Citizens State Bank v. Winters Gov't Securities Corp.*, 361 So.2d 760, 763 (Fla.Dist.Ct.App.1978); *see also Dinsmore v. Martin Blumenthal Ass., Inc.*, 314 So.2d 561 (Fla.1975).

 The Court finds that sub-section (a) of the Specific Jurisdiction section of Florida's long-arm statute is satisfied for the same reasons that the General Jurisdiction section of the statute is satisfied. Here, Defendant Cox reached out to Florida-based cruise lines, insurers, cruise industry associates, and banks solely for the purpose of "[o]perating, conducting, engaging in, or carrying on a business or business venture in this state." Fla. Stat. § 48.193(1)(a). Just as in *Poston*, where the agents solicited business for the foreign defendant, so did Carnival and the FCCA solicit business for Cox. 452 F.Supp. at 571. Further, no presence of corporate officers, lease, or agent in the state of Florida is necessary to meet the requirements of this section. *Citizens State Bank*, 361 So.2d at 763. However, Defendant Cox was able to maintain its business through the work of Carnival, a Florida-based entity, the FCCA, and its Florida-based insurance agents. This is more than enough to meet the standard set forth in sub-section (a).

 As to sub-section (b), "[c]ommitting a tortious act within this state," the Court finds that any tortious acts committed within the state of Florida are insufficient to establish personal jurisdiction. As Plaintiff even alleges, the only Count this would potentially apply to is Count III:

Intentional Misrepresentation. DE 57, p. 31. Plaintiff Meyer was not in the state of Florida when the alleged misrepresentation happened. Thus, the Court would have to find that Cox was working through Carnival when Carnival, in Florida, sold the excursion to Plaintiff Meyer, in another state. The Court declines to find a showing of specific jurisdiction based on this sub-section. Nevertheless, the Court need not make a finding of specific jurisdiction based on this sub-section, as the Court has already found that general jurisdiction exists under section 48.193(2) and specific jurisdiction exists under sub-section 48.193(1)(a).

### B. Due Process Analysis

 After having satisfied the Florida long-arm statute, the Court must determine whether its exercise of jurisdiction "comports with the due process requirements of the Fourteenth Amendment." *Meier*, 288 F.3d at 1274. This due process analysis focuses on whether the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). However, as is the case here, when a "nonresident defendant ... contractually agree[s] to personal jurisdiction in Florida, the usual due process analysis need not be done." *Proudfoot*, 877 F.2d at 921. As the Supreme Court has also held, "the due process analysis is unnecessary where a nonresident defendant has consented to suit in a forum," *Burger King*, 471 U.S. at 473, n. 14, 105 S.Ct. 2174, because "parties to a contract may agree in advance to submit to the jurisdiction of a given court," *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

Here, the conferral of jurisdiction clause contained in the Standard Excursion Contract undeniably satisfies the constitutional due process requirements. Cox states in said clause that it "consents to the personal jurisdiction over it and to the venue of the courts serving the Southern District of Florida in the event of any lawsuit to which CARNIVAL is a party and which is related to, in connection with, arising from or involving the Shore Excursion or the terms of this Agreement." DE 68–2, p. 3. Indeed, this provision demonstrates that Cox intended to submit to the jurisdiction of this Court. Further, "the enforcement of an agreement conferring jurisdiction does not offend due process where the provision is freely negotiated and not unreasonable or unjust." *Proudfoot*, 877 F.2d at 921 (*citing Burger King*, 471 U.S. at 472, 105 S.Ct. 2174). The Court has been given no indication that the agreement was not freely negotiated or made under any conditions suggesting that it was unreasonable or unjust. Therefore, the Court finds that the due process requirements of the Fourteenth Amendment have been satisfied.

## C. Federal Rule of Civil Procedure 4(k)(2)

Plaintiff has also argued that there is alternative federal jurisdiction over Defendant Cox under Rule 4(k)(2). This Rule provides:

(2) Federal Claim Outside State–Court Jurisdiction. For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:

(A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B) exercising jurisdiction is consistent with the United States Constitution and laws.

Fed.R.Civ.P. 4(k)(2). As the Fifth Circuit has explained, this Rule gives a court "personal jurisdiction over foreign defendants for claims arising under federal law when the defendant has sufficient contacts with the nation as a whole to justify the imposition of United States' law but without sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 720 (5th Cir.1996). However, Plaintiff's Amended Complaint (DE 57) does not establish sufficient contacts with the nation as a whole. Therefore, the Court does not, and need not, find that personal jurisdiction exists under Rule 4(k)(2).

## III. Defendant Cox's 12(b)(6) Arguments

Finally, Defendant Cox moves to dismiss certain Counts of Plaintiff's Amended Complaint (DE 57) under Rule 12(b)(6). The Court notes that the legal issues raised by said arguments are more properly addressed in a Motion For Summary Judgment, when discovery may present the Court with a full record upon which it may address and decide said issues.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Defendant Cox & Company, Ltd.'s Motion To Dismiss Plaintiff's Amended Complaint (DE 68) be and the same is hereby **DENIED.**